Slip Op. No. 18-13

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**NUCOR CORPORATION,**

      Plaintiff,

 and

**AK STEEL CORPORATION, ARCELORMITTAL USA LLC, and UNITED STATES STEEL CORPORATION,**

     Plaintiff-Intervenors,

   v.

**UNITED STATES,**

      Defendant,

 and

**EREGLI DEMIR VE CELIK FABRIKALARI T.A.S.,**

     Defendant-Intervenor.

**Before: Timothy C. Stanceu, Chief Judge**

**Court No. 16-00233**

**OPINION**

[Denying plaintiff's motion for judgment on the agency record in an action contesting a final determination of the U.S. International Trade Commission resulting in termination of a countervailing duty investigation of hot-rolled steel from Turkey]

          Dated:  February 28, 2018

  *Joshua S. Turner*, Wiley Rein LLP, of Washington, D.C., argued for plaintiff Nucor Corporation.  With him on the brief were *Alan H. Price*, *Christopher B. Weld*, *Laura El-Sabaawi*, *Cynthia C. Galvez*, and *John T. Lin*.

  *Jane C. Dempsey*, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C, argued for defendant.  On the brief were *Dominic L. Bianchi*, General

Counsel, *Andrea C. Casson*, Assistant General Counsel for Litigation, and *Robin L. Turner*, Attorney-Advisor, Office of the General Counsel.

    *Paul C. Rosenthal*, Kelley Drye & Warren LLP, of Washington D.C., for plaintiff-intervenor ArcelorMittal USA LLC.  With him on the brief were *Kathleen W. Cannon*, *R. Alan Luberda*, and *Brooke M. Ringel.*

    *Daniel L. Schneiderman*, King & Spalding, LLP, of Washington, D.C., for plaintiff-intervenor AK Steel Corporation.  With him on the brief was *Stephen A. Jones*.

    *Jeffrey D. Gerrish*, Skadden Arps Slate Meagher & Flom, LLP, of Washington, D.C., for plaintiff-intervenor United States Steel Corporation.

    *David L. Simon*, Law Office of David L. Simon, of Washington, D.C., for defendant-intervenor Eregli Demir ve Celik Fabrikalari T.A.S.

    Stanceu, Chief Judge: Plaintiff Nucor Corporation ("Nucor"), joined by plaintiff-intervenors ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel Corporation, contests a final negative determination of the U.S. International Trade Commission (the "Commission," or the "ITC") that resulted in termination of a countervailing duty investigation of imports of certain hot-rolled steel flat products ("hot-rolled steel") from Turkey. The Commission terminated the investigation upon finding that the volume of subsidized hot-rolled steel imports from Turkey was negligible.  The court sustains the Commission's determination.

## I. BACKGROUND

### A.  The Contested Determination

    The determination contested in this action was published as *Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, 81 Fed. Reg. 66,996 (Int'l Trade Comm'n Sept. 29, 2016) ("*Final Determination*"). The views of the Commission were contained in *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, USITC Pub. 4638, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Sept. 2016) (Final) (P.R.

Doc. 494),[1] *available at* https://www.usitc.gov/publications/701_731/pub4638.pdf (last visited

Feb. 23, 2018) ("*Views of the Commission*").

   B.  The Commission's Countervailing Duty Investigation of Hot-Rolled Steel from Turkey

      On August 11, 2015, six domestic steel producers filed, concurrently with the

Commission and the International Trade Administration, U.S. Department of Commerce

("Commerce," or the "Department"), a petition seeking the initiation of antidumping duty

("AD") and countervailing duty ("CVD") investigations of hot-rolled steel from various

countries.  The petitioners, which were Nucor, plaintiff-intervenors AK Steel Corporation,

ArcelorMittal USA LLC, and United States Steel Corporation, and two other U.S. steel

producers, alleged that the industry producing hot-rolled steel in the United States was materially

injured or threatened with material injury by reason of dumped and subsidized imports of

hot-rolled steel from Brazil, Korea, and Turkey and from dumped imports of hot-rolled steel

from Australia, Japan, the Netherlands, and the United Kingdom.

      In response to the petition, the Commission initiated ten separate investigations.[2]  The

period of investigation ("POI") for the ITC's countervailing duty investigation of Turkish

imports was January 1, 2013 through March 31, 2016.  *Views of the Commission* at 10 n.31.

---

[1] This Opinion contains no confidential information.  Public documents and public versions of confidential documents from the administrative record are cited as "P.R. Doc. ___".  Where necessary, confidential documents from the administrative record are cited as "C.R. Doc. ___".

[2] The ITC designated the countervailing duty investigations as Investigation Nos. 701-545 (Brazil), 701-546 (Korea), and 701-547 (Turkey).  The antidumping duty investigations were Investigation Nos. 731-1291 (Australia), 731-1292 (Brazil), 731-1293 (Japan), 731-1294 (Korea), 731-1295 (the Netherlands), 731-1296 (Turkey), and 731-1297 (United Kingdom).  *See* Int'l Trade Comm'n, Antidumping and Countervailing Duty Orders in Place As of February 14, 2018, *available at* https://www.usitc.gov/sites/default/files/trade_remedy/documents/orders.xls (last visited Feb. 21, 2018).

In its various antidumping duty and countervailing duty investigations, the Commission

determined that the U.S. industry producing hot-rolled steel was being materially injured by

reason of dumped imports of hot-rolled steel from Australia, Brazil, Japan, Korea, the

Netherlands, Turkey, and the United Kingdom.  *Final Determination*, 81 Fed. Reg. at 66,996.

The Commission also reached an affirmative injury determination as to imports found to be

subsidized by the governments of Brazil and Korea.  *Id.*  The Commission stated that it "further

finds that imports of hot-rolled steel that have been found by Commerce to be subsidized by the

government of Turkey are negligible."  *Id.*  On that basis, the ITC terminated Investigation

No. 701-547, its countervailing duty investigation of hot-rolled steel from Turkey.  Due to the

ITC's negative determination, Commerce did not issue a countervailing duty order on hot-rolled

steel from Turkey.  *See* 19 U.S.C. § 1671d(c)(2).

### C.  Proceedings Before the Court of International Trade

Nucor commenced this litigation on November 23, 2016.  Compl. (Nov. 23, 2016), ECF

No. 8.  Before the court is a motion for judgment on the agency record filed under USCIT

Rule 56.2 on behalf of plaintiff Nucor and plaintiff-intervenors AK Steel Corporation,

ArcelorMittal USA, LLC, and United States Steel Corporation.[3]  Pl. Nucor Corporation and

Pl.-Intervenors ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel

Corporation's Rule 56.2 Mot. for J. on the Agency Record (May 8, 2017), ECF Nos. 49

(confidential), 50 (public) ("Pl.'s Br.").  The motion is opposed by defendant U.S. International

---

[3] The court addresses in this Opinion the arguments presented by plaintiff Nucor. Plaintiff-intervenors joined in each of these arguments and did not submit separate briefs. Counsel for plaintiff-intervenor ArcelorMittal USA LLC appeared at oral argument but deferred to the arguments made by Nucor.  The remaining plaintiff-intervenors did not appear at oral argument.

Trade Commission and by defendant-intervenor Eregli Demir ve Celik Fabrikalari T.A.S., a

Turkish producer of hot-rolled steel.  The court held oral argument on January 18, 2018.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c) (2012), which grants jurisdiction of civil actions brought under

section 516A(a)(2)(B)(i) of the Tariff Act of 1930 (the "Tariff Act"), 19 U.S.C.

§ 1516a(a)(2)(B)(i).[4]  Where, as here, an action is brought under 19 U.S.C. § 1516a(a)(2) seeking

review of a final determination of the Commission reached under 19 U.S.C. § 1671d, "[t]he court

shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

### B.  Plaintiff's Claims in this Litigation

In its countervailing duty investigation of hot-rolled steel from Turkey, the ITC made two

related negligibility determinations, each of which is the basis for a claim Nucor asserts in this

litigation.

### 1.  Nucor's Claim under 19 U.S.C. § 1677(24)(A)(i) ("Clause (i)")

The ITC determined that the subsidized imports of hot-rolled steel from Turkey were

"negligible" within the meaning of 19 U.S.C. § 1677(24)(A)(i) ("clause (i)").  Imports are

negligible under clause (i) if they "account for less than 3 percent of the volume of all such

merchandise imported into the United States in the most recent 12-month period for which data

---

[4] Citations to the Tariff Act of 1930 in this Opinion are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

are available that precedes . . . the filing of the petition."[5]  *Id.*  The Commission found, first, that

the volume of imports of Turkish hot-rolled steel that were subsidized by the government of

Turkey was less than 3% of the volume of all hot-rolled steel imported into the United States

during the relevant period (which the ITC determined to be August 1, 2014 to July 31, 2015).

*Views of the Commission* at 12-13.  The Commission reached that finding following the

determination by Commerce of a *de minimis* final subsidy rate for the hot-rolled steel produced

and exported to the United States by one of the Turkish producer/exporters subject to the

Department's countervailing duty investigation, Colakoglu Dis Ticaret A.S. ("Colakoglu").

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic*

*of Turkey*, 81 Fed. Reg. 53,433, 53,434 (Int'l Trade Admin. Aug. 12, 2016).

Nucor does not contest the ITC's finding that the volume of Turkish hot-rolled steel

imports Commerce found to have been subsidized was less than 3% of the total import volume of

hot-rolled steel imported into the United States during the relevant period.  Instead, Nucor claims

that the ITC misinterpreted the statute in making the negligibility determination under clause (i)

according to that finding.  In support of this claim, Nucor argues that the statute required the ITC

to base the negligibility calculation on the volume of all of the Turkish imports originally subject

to the countervailing duty investigation, not merely those Commerce later found to be

subsidized.  Nucor argues in the alternative that the statute required the Commission to make the

negligibility calculation under clause (i) by including not only the volume of imports Commerce

---

[5] The general definition of "negligible" is subject to an exception set forth in clause (ii) of
19 U.S.C. § 1677(24)(A), under which "[i]mports that would otherwise be negligible under
clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all
countries described in clause (i) with respect to which investigations were initiated on the same
day exceeds 7 percent of the volume of all such merchandise imported into the United States
during the applicable 12-month period."  19 U.S.C. § 1677(24)(A)(ii) ("clause (ii)").  Nucor does
not assert a claim as to clause (ii).

found to be subsidized, but also the volume of imports Commerce found to be dumped in the

parallel antidumping duty investigation of hot-rolled steel from Turkey.  According to Nucor,

had the ITC correctly applied the negligibility provision in clause (i) according to either of these

methods, it would have had to find the import volume to be 7.4% of the volume of total imports

of hot-rolled steel from Turkey during the relevant period, well exceeding the threshold for

non-negligibility.

### 2.  Nucor's Claim under 19 U.S.C. § 1677(24)(A)(iv) ("Clause (iv)")

Nucor's second claim is in the alternative as to its first claim.  Nucor claims that, even if

the ITC were correct in its negligibility determination under clause (i), it erred in failing to apply

an exception to negligibility provided for under 19 U.S.C. § 1677(24)(A)(iv) ("clause (iv)").

According to clause (iv), the Commission, for purposes of determining threat of material injury,

"shall not treat imports as negligible if it determines that there is a potential that imports from a

country described in clause (i) will imminently account for more than 3 percent of the volume of

all such merchandise imported into the United States . . . ."  *Id.*  Nucor claims that the ITC's

finding that there was no such potential was unsupported by substantial evidence on the record.

Having determined under clause (i) that subsidized imports of hot-rolled steel from

Turkey were negligible and having further determined under clause (iv) that there was not a

potential that subsidized hot-rolled steel imports from Turkey would imminently exceed the 3%

threshold for threat, the Commission terminated the countervailing duty investigation.  *Views of

the Commission* at 12-14.

### C.  The Commission Did Not Misinterpret the Tariff Act when Making Its Negligibility Determination under Clause (i)

If Commerce reaches final affirmative determinations of subsidization and dumping in

parallel investigations on imports of merchandise from the same country, the ITC is required by

the Tariff Act to make separate final determinations as to whether an industry (or industries) in

the United States is materially injured, or threatened with material injury, by reason of imports

that are subsidized and by reason of imports that are sold (or likely to be sold) in the United

States at less than fair value, i.e., imports that are dumped.[6] *See* 19 U.S.C. §§ 1671d(b)(1) (final

determination by the ITC of injury or threat by reason of imports found by Commerce to be

subsidized), 1673d(b)(1) (final determination by the ITC of injury or threat by reason of imports

found by Commerce to be dumped).  The Tariff Act provides separate procedures for initiating

and conducting each type of investigation.  *See*, *e.g.*, *id.* §§ 1671a (procedures for initiating a

countervailing duty investigation), 1673a (procedures for initiating an antidumping duty

investigation).  In either case, it is Commerce, not the ITC, that determines the "class or kind" of

imported merchandise that will be subject to investigation.  *See id.* §§ 1671(a)(1) (countervailing

duties), 1673(a)(1) (antidumping duties).  The element of causation being essential to its

statutorily-defined inquiry, the Commission ascertains, in the final phase of one of its

investigations, whether a domestic industry (or industries, should it find multiple "domestic like

products") is materially injured or threatened with material injury "by reason of" the imports that

have been found by Commerce to be unfairly traded, i.e., either subsidized or dumped.

*See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1).  Therefore, the ITC does not make its general, final

injury or threat determination based on the entire class or kind of merchandise that Commerce

originally designated as subject to investigation; instead, it looks to the imports or sales (or likely

---

[6] The Tariff Act also refers to a final ITC determination of whether "the establishment of an industry in the United States is materially retarded."  19 U.S.C. §§ 1671d(b)(1)(B) (countervailing duties), 1673d(b)(1)(B) (antidumping duties).  Material retardation of the establishment of a domestic industry was not at issue in this case.

sales) for importation that are subsidized (in a countervailing duty investigation) or sold at less

than fair value (in an antidumping duty investigation).

In its countervailing duty investigation of hot-rolled steel from Turkey, the ITC made its

clause (i) negligibility calculation using as the numerator the imports of merchandise that

Commerce found to have been subsidized in its final countervailing duty determination. *Views*

*of the Commission* at 13. The Commission excluded the U.S. imports of merchandise exported

by Colakoglu because Commerce found these imports to have had a *de minimis* subsidy rate.

The ITC explained its method of performing the clause (i) negligibility calculation as follows:

> In Commerce's final countervailing duty determination on hot-rolled steel
> from Turkey, exports produced by Colakoglu received a *de minimis* subsidy
> margin. Consequently, imports from Turkey that are subject to the antidumping
> duty investigation are different from those subject to the countervailing duty
> investigation. Hot-rolled steel imports from Turkey that are subject to the
> antidumping duty investigation were 7.4 percent of total imports during this
> period and therefore were above negligible levels. Subsidized imports from
> Turkey (excluding exports produced by Colakoglu), however, were * * * percent
> of total imports during the August 2014 to July 2015 period, and thus fell below
> the three percent negligibility threshold for the present material injury analysis.

*Id.* (footnotes omitted) (asterisks indicate omission of confidential information).

1.  The Statute Does Not Unambiguously Require the ITC to Base its Clause (i) Negligibility
Calculation on the Volume of All Imports from the Named Country that Were Initially Subject to
the Investigation

According to the primary argument Nucor makes in support of its first claim, the

negligibility calculation under clause (i) differs from the general injury and threat determination

made under 19 U.S.C. § 1671(b)(1), which is made on the basis of the *subsidized* merchandise,

in that it must be made on the basis of *all* the merchandise originally subject to the ITC's

countervailing duty investigation—in this instance, all Turkish imports of hot-rolled steel

occurring during the 12-month period identified in clause (i). Relying upon "Step One" of an

analysis conducted according to *Chevron U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*,

467 U.S. 837 (1984) (*"Chevron"*), Pl.'s Br. 9, Nucor argues that "the plain language of the

statute" unambiguously requires this result. *Id.* at 12, 14. The court disagrees.

As the Supreme Court instructed in *Chevron*, when "Congress has directly spoken to the

precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for

the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Chevron*, 467 U.S. at 842-43 (footnote omitted). Stated narrowly and precisely, the

first question raised by Nucor's principal statutory construction argument is whether negligibility

under clause (i) of 19 U.S.C. § 1677(24)(A), when determined in the final phase of an ITC

investigation as required by 19 U.S.C. § 1671d(b)(1), is required by the plain statutory language

to be calculated on the basis of all imports originally within the scope of the investigation.

The statute, in 19 U.S.C. § 1671d(b)(1), reads in pertinent part as follows:

> The Commission shall make a final determination of whether . . . an
> industry in the United States . . . is materially injured, or . . . is threatened with
> material injury . . . by reason of imports . . . of the merchandise *with respect to
> which the administering authority* [i.e., Commerce] *has made an affirmative
> determination under subsection (a) of this section.* If the Commission determines
> that imports *of the subject merchandise* are negligible, the investigation shall be
> terminated.

19 U.S.C. § 1671d(b)(1) (emphasis added). The first sentence in the provision contains a

reference to the imports Commerce found to be subsidized in the completed final phase of the

Department's countervailing duty investigation that precedes (and is the basis of) the final ITC

determination.[7]  *See* 19 U.S.C. § 1671d(a). The second sentence does not use the same language

as the first sentence in describing the imports upon which the ITC is to make its negligibility

---

[7] If Commerce, in the final phase of its countervailing duty investigation, finds that a
countervailable subsidy is not being provided with respect to the subject merchandise, it
terminates the investigation, and as a result the ITC does not make a final injury or threat
determination.  19 U.S.C. § 1671d(c)(2).

determination under clause (i) of 19 U.S.C. § 1677(24)(A).  Were the court to accept Nucor's

plain meaning argument, it would have to conclude that the term "imports of the subject

merchandise," as used in the second sentence, does not refer to the imports identified in the first

sentence and instead is an unambiguous reference to all merchandise originally subject to the

countervailing duty investigation.  In support of this argument, Nucor cites the statutory

definition of the term "[n]egligible imports," which is "imports from a country of merchandise

*corresponding to a domestic like product identified by the Commission*" that "account for less

than 3 percent of the volume of all such merchandise imported into the United States . . . ."

19 U.S.C. § 1677(24)(A)(i) (emphasis added).  Nucor also cites the statutory definition of

"subject merchandise," which is "the class or kind of merchandise that is within the scope of an

investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of

this title [now repealed], or a finding under the Antidumping Act, 1921."  19 U.S.C. § 1677(25).

    The court cannot conclude that the second sentence in 19 U.S.C. § 1671d(b)(1)

necessarily must be read to apply to a broader category of merchandise than the merchandise

described in the first sentence, which is merchandise Commerce has determined to be

subsidized.[8]  The definition in 19 U.S.C. § 1677(24) of "[n]egligible imports" applies not only to

the question of whether "imports of the subject merchandise are negligible" under § 1671d(b)(1);

it also applies to the question of whether "imports of the subject merchandise are negligible"

under § 1671b(a)(1), which pertains to the ITC's preliminary determination (and which, if

negative, results in termination of the investigation).  At the time the ITC makes its preliminary

---

[8] In support of the argument it grounds in 19 U.S.C. §§ 1677(24) and 1677(25), Nucor cites *Kyocera Solar, Inc. v. United States Int'l Trade Comm'n*, 844 F.3d. 1334, 1339-40 (Fed. Cir. 2016).  In contrast to this case, *Kyocera* involved the issue of whether the ITC must conduct two separate, country-specific negligibility analyses when the subject merchandise is further processed in, and imported from, a country other than the named country.

determination, Commerce has not yet made any determination (preliminary or final) as to

whether the imported merchandise then subject to the investigation is subsidized.  Therefore, it is

at least plausible that the definition of "negligible imports" in 19 U.S.C. § 1677(24) was written

generally so that it could apply both to § 1671b(a)(1) and to § 1671d(b)(1).  Nor does the

definition of "subject merchandise" in § 1677(25), which is used in the second sentence of

§ 1671d(b)(1), compel the conclusion that this second sentence refers to all merchandise initially

subject to investigation.  The § 1677(25) definition is sufficiently broad as to apply to various

phases of an investigation or review.  *See* 19 U.S.C. § 1677(25) ("the class or kind of

merchandise that is within the scope of an investigation, a review, a suspension agreement, an

order under this subtitle . . . or a finding under the Antidumping Act, 1921").  At the time the

ITC makes its final injury and threat determination (and, necessarily, its final clause (i)

negligibility determination), Commerce already has made its subsidy determination.  Moreover,

merchandise Commerce has determined *not* to be subsidized is merchandise that, at least

arguably, is by that time no longer "within the scope of" the investigation.

   In summary, the text of the statute does not unambiguously require the ITC to perform its

clause (i) negligibility calculation on the basis of all imports subject to the countervailing duty

investigation, whether subsidized or not.  The court, therefore, rejects Nucor's *Chevron* Step

One argument.  Moreover, as the court discusses in the next section of this Opinion, an analysis

performed under Step One of *Chevron* compels a conclusion directly contrary to that advocated

by Nucor.

2.  Congress Intended that the ITC Would *Not* Base Its Clause (i) Negligibility Determination on the Volume of All Imports from the Named Country that Initially Were Subject to the Investigation

As an alternative to the *Chevron* Step One argument the court rejected above, Nucor makes a *Chevron* Step Two argument.  Under Step Two of a *Chevron* analysis, a court will defer to an agency's reasonable interpretation of a statute the agency is charged by law to administer, even if the court might prefer a contrary interpretation.  *Chevron*, 467 U.S at 843 & n.11.

Nucor argues that "[e]ven if the language of the statute was [*sic*] ambiguous under *Chevron* Step One, the interpretation offered by the Commission must fail" as unreasonable, as not "permissible under the terms adopted by the statute," and as "arbitrary and capricious."  Pl.'s Br. 19 (internal citation omitted).  This argument is refuted by the congressional intent underlying the negligibility provisions in the statute, as shown by the relevant legislative history.  While both the ITC's interpretation and Nucor's interpretation could be plausible constructions of the statutory language, only the ITC's interpretation accords with the congressional intent.  Under *Chevron* Step One, a court employs "the traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9.  Those tools include an examination of not only the statutory text and structure but also the legislative history.  *See, e.g.*, *Aqua Products, Inc. v. Matal*, 872 F.3d 1290, 1296, 1303, 1312-14 (Fed. Cir. 2017) (*en banc*); *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) ("We may find Congress has expressed unambiguous intent by examining the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.") (internal quotation marks and citations omitted); *Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*, 844 F.3d 1334, 1338 (Fed. Cir. 2016).  Because Step One of a proper *Chevron* analysis resolves the question presented, the court does not proceed to *Chevron* Step Two.

The "negligibility" provisions of the countervailing and antidumping duty statute were enacted by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), to implement the "Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994" ("Antidumping Agreement"). *Id.* at § 101(d)(7) (codified at 19 U.S.C. § 2511(d)(7)). The Statement of Administrative Action ("SAA") accompanying the URAA explains that effectuating the negligibility provisions in U.S. law was accomplished by amending the following sections of the Tariff Act: sections 771(24) [19 U.S.C. § 1677(24), the definition of "negligibility"], 703(a) [19 U.S.C. § 1671b(a), negligibility in an ITC preliminary countervailing duty investigation], 705(b)(1), [19 U.S.C. § 1671d(b), negligibility in an ITC final countervailing duty investigation], 733(a) [19 U.S.C. § 1673b(a), negligibility in an ITC preliminary antidumping duty investigation], and 735(b)(1) [19 U.S.C. § 1673d(b), negligibility in an ITC final antidumping duty investigation]. *Uruguay Round Agreements Act: Statement of Administrative Action*, H.R. Doc. No. 103-316, vol. 1 at 855 (1994) (*"SAA"*), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4187-88.

The SAA states that "[t]he Agreements require termination of investigations if the investigating authority determines that the volume of *dumped* or *subsidized* imports is negligible." *Id.* (emphasis added). In this way, the SAA reveals the purpose of the new provisions, which was to implement a requirement to which the United States agreed in international negotiations. Nucor's primary statutory construction argument—that the ITC is required by the statute to base its clause (i) negligibility calculation on the volume of all imports of merchandise originally subject to the countervailing duty investigation—is contradicted by this statement of congressional purpose. Further, Article 5.8 of the Anti-dumping Agreement reached in the Uruguay Round negotiations provides that "[t]here shall be immediate termination

in cases where . . . the volume of *dumped* imports, actual or potential, or the injury, is negligible"

and that "[t]he volume of *dumped* imports shall normally be regarded as negligible if the volume

of *dumped* imports from a particular country is found to account for less than 3 per cent of the

imports of the like product in the importing Member, unless countries which individually

account for less than 3 per cent of the imports of the like product in the importing Member

collectively account for more than 7 per cent of imports of the like product in the importing

Member."  Anti-dumping Agreement, Art. 5.8 (emphasis added).  Although there is no parallel

provision in the Uruguay Round agreement on subsidies, the SAA mentions that "the 'three

percent' definition of negligible imports appears only in the Antidumping Agreement" but

clarifies that as effected in U.S. law, "the definition of negligible imports in new section 771(24)

[19 U.S.C. § 1677(24)] will be applicable to both antidumping and countervailing duty

investigations."  *SAA* at 855, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4188.  Other legislative

history of the URAA is consistent with the SAA in explaining that the clause (i) negligibility

analysis is performed on the basis of the volume of dumped or subsidized imports.  Report of the

House Committee on Ways and Means to Accompany H.R. 5110, Rep. No. 103–826 (1994)

at 71 ("House Report").

In summary, Congress did not intend for the ITC to perform its clause (i) negligibility

calculation on the basis of all imports from the named country that initially were subject to the

countervailing duty investigation.

### 3.  The Statute Does Not Allow the ITC to Base the Clause (i) Negligibility Calculation on the Volume of All Unfairly Traded Imports from the Named Country

Nucor's next argument, which the court addresses as an argument in the alternative,[9] is that even were the statute construed not to require the ITC to base the clause (i) negligibility calculation on all imports from the named country originally subject to the countervailing duty investigation, the ITC still must be held to have acted contrary to law in basing that calculation only on the subsidized imports rather than on all Turkish imports found by Commerce to have been unfairly traded, i.e., either dumped or subsidized, in the parallel CVD and AD investigations.  Pl.'s Br. 14 (arguing that "[i]n no uncertain terms, the statute requires the Commission to consider all in-scope, unfairly traded merchandise in its negligibility analysis" and that "[t]here is no basis under the statute for the Commission's separate AD and CVD negligibility analysis, nor for the exclusion of Colakoglu's imports.").  Because the volume of Turkish imports Commerce determined to be dumped amounted to 7.4% of the total volume of U.S. imports from all countries, the ITC did not terminate the parallel antidumping duty investigation of hot-rolled steel from Turkey on the basis of negligible imports.  The alternate construction of the statute Nucor urges upon the court would preclude the Commission's termination of the countervailing duty investigation as well, based on the volume of imports Commerce found to have been dumped.

---

[9] In its Rule 56.2 brief, Nucor conflated what are essentially two separate statutory construction arguments.  In response to the court's observation at oral argument that Nucor appeared to be making two arguments in the guise of one, Nucor indicated that the court should review its argument that ITC should have combined all unfairly traded, i.e., the dumped and the subsidized, import volumes as an alternative to its argument that the statute required negligibility to be determined on the basis of all merchandise originally subject to investigation, whether or not found to be unfairly traded.  Oral Argument (Jan. 18, 2018), ECF No. 70.

In support of its alternate statutory construction argument, Nucor again points to

19 U.S.C. § 1677(24), which provides that "imports from a country of merchandise

*corresponding to a domestic like product identified by the Commission* are 'negligible' if such

imports account for less than 3 percent of the volume of all such merchandise imported into the

United States" in the relevant 12-month period.  19 U.S.C. § 1677(24)(A)(i) (emphasis added).

According to Nucor, "[t]his plain language thus requires the Commission to analyze all unfairly

traded merchandise in determining whether the imports in question are negligible."  Pl.'s Br. 14.

Nucor's alternate argument does not withstand scrutiny upon examination of the statutory

language and structure.  The congressional directive is that "[i]f the Commission determines that

imports of the subject merchandise are negligible, *the* investigation shall be terminated."

19 U.S.C. § 1671d(b)(1) (emphasis added).  The directive of § 1671d(b)(1) pertains solely to a

countervailing duty investigation that is initiated according to § 1671a ("Procedures for initiating

a countervailing duty investigation") and that was continued upon an affirmative determination

by the Commission under § 1671b(a).  Nucor's construction of § 1671d(b) awkwardly would

read the term "subject merchandise" to refer to merchandise beyond the merchandise that is

"subject" to the investigation being considered for termination.  It would do this even though

§ 1671d(b)(1) makes no mention of a parallel antidumping duty investigation (which is initiated

under 19 U.S.C. § 1673a ("Procedures for initiating an antidumping duty investigation")).  Nor is

there any such reference elsewhere within § 1671d or in § 1671b.  The statute provides separate

procedures for CVD investigations (in Part I of Subtitle IV of the Tariff Act) and for AD

investigations (in Part II of Subtitle IV) and does not provide for anything that could be termed a

"countervailing and antidumping duty investigation."

Nucor's reliance on 19 U.S.C. § 1677(24), the definitional provision for "negligible

imports," which applies to both the CVD investigations of Part I and the AD investigations of

Part II, is misplaced. As the court discussed previously in this Opinion, the breadth of the

definition in § 1677(24)(A) allows the definition to apply flexibly to various provisions in the

statute. It applies not only to the ITC's final determinations in countervailing or antidumping

duty investigations, but also to the ITC's preliminary determination in a countervailing duty

investigation (19 U.S.C. § 1671b(a)(1)) and to its preliminary determination in an antidumping

duty investigation (19 U.S.C. § 1673b(a)(1)). In both of the latter instances, Commerce has not

yet made a final determination on whether the imports subject to the investigation are unfairly

traded, i.e., subsidized or dumped, respectively. Procedurally, Commerce provided for separate

ITC negligibility determinations in each of the four provisions implicating the definition of

"negligible imports," calling for distinct CVD and AD negligibility determinations at both the

preliminary and final stages of the investigation.

Moreover, Nucor's alternate statutory construction argument is difficult to reconcile with

subpart (B) of § 1677(24), in which Commerce provided for a different method of determining

negligibility under clause (i) in a countervailing duty investigation than it did for an antidumping

duty investigation. In CVD investigations, but not AD investigations, the clause (i) negligibility

threshold is "less than 3 percent" in the ordinary instance, § 1677(24)(A)(i), but is modified to

less than "4 percent" by operation of subpart (B) when the "subject merchandise" is from

"developing countries." § 1677(24)(B). Congress was specific in applying the latter "[i]n the

case of an investigation under section 1671 of this title," i.e., a countervailing duty investigation,

and made no parallel provision applicable to antidumping duty investigations under

section 1673. Subpart B of § 1677(24) uses the term "subject merchandise" in a way that must

be read to refer solely to the merchandise that is subject to the particular countervailing duty investigation, not a related antidumping investigation.

The legislative history is also contrary to Nucor's interpretation.  The SAA states that "[t]he Agreements require termination of investigations if the investigating authority determines that the volume of dumped *or* subsidized imports is negligible."  *SAA* at 855, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4187 (emphasis added); *see also* House Report at 71 ("Article 5.8 requires termination of investigations if the investigating authority determines that the volume of dumped *or* subsidized imports is negligible.") (emphasis added).  A reading of "or" to mean "and" would be a strained interpretation, at the least.  Article 5.8 of the Anti-dumping Agreement, which the court discussed previously, shows that such an interpretation could not have been intended. Article 5.8 provides unambiguously that "[t]here shall be immediate termination in cases where the authorities determine that the margin of dumping is *de minimis*, or that the volume of dumped imports, actual or potential, or the injury, is negligible."  Anti-dumping Agreement, Art. 5.8.  Nucor's interpretation of the statute to require the result it seeks in this case, continuation of the countervailing duty investigation despite negligible subsidized imports, necessarily also would require the ITC to refrain from terminating an antidumping duty investigation in a case in which the volume of dumped imports is negligible, so long as the volume of subsidized imports in a parallel countervailing duty investigation is not negligible. Such a result would contravene the plain meaning and purpose of Article 5.8, the provision in the Anti-dumping Agreement the URAA was implementing.

Nucor raises various additional arguments in an attempt to demonstrate that the ITC's separate negligibility determination in the CVD investigation of hot-rolled Turkish steel was unlawful.  The court is not persuaded by these arguments.

Nucor alludes to "the Tariff Act's purpose and policy goals," Pl.'s Br. 16-21, supporting

its argument with a discussion of the purposes of the cumulation provisions in the statute and of

the legislative history of the negligibility exception to cumulation that existed in the statute prior

to the amendment by the URAA. *Id.* at 17-18.  Nucor fails to show any relevance of those

previous negligibility provisions to the issue Nucor raises as to current law.

Nucor also argues that in the past the Commission has combined subsidized and dumped

imports in performing the negligibility calculation under clause (i) and that, accordingly, the

court should not accord the ITC's interpretation *Chevron* deference.  *Id.* at 21-25.  The ITC's

applications of the negligibility provisions in past investigations, whether or not inconsistent

with its decision in this case, do not change the court's conclusion.  As discussed above,

Congress intended for the ITC to make the clause (i) negligibility determination individually in a

countervailing duty investigation, on the basis of the imports Commerce found to be subsidized.

The court, therefore, rejects both of Nucor's statutory construction arguments and sustains

according to Step One of a *Chevron* analysis the ITC's interpretation of the statute, under which

ITC conducts separate negligibility determinations in the case of parallel CVD and AD

investigations, as it did in the parallel investigations of hot-rolled steel from Turkey.  The

question of whether the Commission's statutory interpretation is to be accorded deference under

Step Two of a *Chevron* analysis does not arise.

### 4.  The Court Declines to Remand the Final Determination for Additional Explanation of the Commission's Statutory Construction of the Clause (i) Negligibility Provision

Nucor argues that the Commission's clause (i) negligibility determination must be set

aside because the Commission failed to respond to arguments made before it on the correct

interpretation of the negligibility provision.  Pl.'s Br. 25.  Specifically, Nucor directs the court's

attention to an argument ArcelorMittal USA LLC and AK Steel Corporation made during the

agency proceeding: "The relevant statute provides that the Commission should consider 'imports

from a country of merchandise corresponding to a domestic like product' in calculating

negligibility . . . .  This language plainly covers all subject imports, whether dumped or

subsidized."  *Id.* (quoting AK Steel Corporation's Post-Hearing Brief (P.R. Doc. 404) at 14, n.70

and citing ArcelorMittal USA LLC's Post-Hearing Br. (P.R. Doc. 394) at 14 and AK Steel

Corporation's Final Comments (P.R. Doc. 446) at 14-15).

In Nucor's view, the ITC violated the statutory requirement "to include in its final

determination 'an explanation of the basis for its determination that addresses relevant arguments

that are made by interested parties who are parties to the investigation . . . concerning volume,

price effects, and impact on the industry of imports of the subject merchandise'—issues to which

the negligibility analysis pertains directly."  Pl.'s Br. 25 (quoting 19 U.S.C. § 1677f(i)(3)(B)).

Because it includes a reference to "volume . . . of imports," 19 U.S.C. § 1677f(i)(3)(B) plausibly

can be construed to apply to the argument Nucor quotes.  Therefore, in considering Nucor's

argument the court presumes, without deciding, that § 1677f(i)(3)(B) applies in the situation

presented.  The ITC addressed the argument in question in a footnote, which in pertinent part

reads as follows:

> Domestic producers recognize that Commerce issued a *de minimis* final
> subsidy margin for Turkish producer Colakoglu but argue that Turkish imports
> are above the three percent threshold and thus are not negligible. . . .
> ArcelorMittal also urges the Commission to "follow its practice in *Certain Oil
> Country Tubular Goods from India, et al.*, where it made a single negligibility
> calculation for Turkey using the total volume of imports from the country – and
> not separate AD and CVD negligibility calculations – though one Turkish
> producer received a zero margin in the AD case."  ArcelorMittal Posthearing
> Brief at 14 n.13.  The Commission's opinion in that case, however, did not
> purport to address that issue.

*Views of the Commission* at 13 n.52.  Nucor is correct that the ITC did not provide the reasoning

underlying its statutory construction of the clause (i) negligibility provision that it has presented

before the court.  Nevertheless, the court disagrees with Nucor's argument that the negligibility

determination under clause (i) must be set aside for lack of an adequate explanation and

remanded to the Commission.

ArcelorMittal and AK Steel raised the statutory construction argument during the ITC

investigation in only a cursory way, alluding in one sentence to a single phrase within 19 U.S.C.

§ 1677(24) without providing an analysis of that provision or how it relates to other statutory

provisions to compel their conclusion that the ITC misinterpreted the statute.  It is fair to say that

the statutory construction arguments Nucor makes to the court were not fully presented below for

purposes of satisfying the requirement to exhaust administrative remedies.  *See* 28 U.S.C.

§ 2637(d) (directing the Court to require the exhaustion of administrative remedies, where

appropriate).  On the other hand, the Commission's cursory dismissal of the argument made

before it arguably did not fulfill the requirement in 19 U.S.C. § 1677f(i)(3)(B) because it failed

to raise the defense, i.e., the statutory interpretation, that the Commission advocates before the

court.

Even though the Commission's decision failed to develop fully and explain the

Commission's position on the statutory interpretation issue involving clause (i), the court sees no

purpose that would be served by remanding that decision to the Commission for a

redetermination or a further explanation.  Although neither the domestic producers nor the

defendant ITC fully developed their respective positions on this issue (which is a pure question

of law) during the Commission's investigation, both sides have taken the full opportunity to

present their arguments in their submissions to the court in this proceeding.

### D.  The Commission's Determination that Imports of Subsidized Hot-Rolled Steel from Turkey Were Unlikely to Imminently Exceed the 3% Statutory Threshold is Supported by Substantial Evidence on the Record

#### 1.  The Exception to Negligibility under 19 U.S.C. § 1677(24)(A)(iv) ("Clause (iv)")

Clause (iv) of 19 U.S.C. § 1677(24)(A) creates an exception to negligibility under

clause (i), as follows:

> [T]he Commission shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States.  The Commission shall consider such imports only for purposes of determining threat of material injury.

19 U.S.C. § 1677(24)(A)(iv).  Nucor claims that the Commission's finding under clause (iv), that

there was no potential that imports of subsidized hot-rolled steel from Turkey would imminently

exceed 3% of total U.S. imports, was unsupported by substantial evidence and otherwise not in

accordance with law.  Pl.'s Br. 27 (citing *Views of the Commission* at 13-14).

#### 2.  The Commission's Negative Clause (iv) Determination

The Commission summarized its negative clause (iv) determination as follows:

> We find that the sporadic pattern of imports from the Turkish producers subject to the countervailing duty investigation, combined with their consistently relatively small share of total Turkish hot-rolled steel imports, increasing capacity utilization, and strong home-market orientation, demonstrate that any sustained increase in the percentage of subsidized subject imports from Turkey relative to all imports is unlikely.  Therefore, the record supports a conclusion that there is not a potential that subsidized subject imports from Turkey will imminently exceed three percent of total imports.

*Views of the Commission* at 14.

#### 3.  Nucor's Arguments Challenging the ITC's Negative Clause (iv) Determination

In contesting the Commission's clause (iv) determination, Nucor argues that "[t]he

Commission based its determination on flawed factual considerations, and it insufficiently

addressed significant evidence on the record indicating that these Turkish imports were likely to

imminently exceed the negligibility threshold."  Pl.'s Br. 2-3.  Specifically, Nucor summarizes

its arguments by asserting, first, that "[t]he Commission's finding that these Turkish imports

were 'sporadic' was not supported by the record, which showed significant volumes of such

imports in increasing amounts, both absolutely and as a share of total hot-rolled steel imports."

Pl.'s Br. 3.  Second, Nucor argues that "[t]he Commission's assertion that non-Colakoglu

Turkish imports show a 'strong home-market orientation' is similarly unsupported and fails to

account for substantial contradictory evidence showing the export-oriented nature of Turkish

producers."  *Id.*  Third, Nucor argues that "the Commission impermissibly ignored increases in

inventories of hot-rolled steel in the Turkish industry excluding Colakoglu in reaching its

determination."  *Id.*  The court rejects these arguments, as discussed below.

    4.  Substantial Record Evidence Supported the ITC's Finding of "Sporadic" Imports

       The Commission expressed its finding that the subsidized imports of hot-rolled steel from

Turkey were "sporadic" as follows:  "On a monthly basis the volume of subject imports from

Turkey subject to the countervailing duty investigation as well as their percentage of total

imports were sporadic, including in the period prior to the filing of the petition."  *Views of the*

*Commission* at 13 (footnotes omitted).  In support, the Commission referred specifically to

"Table H-1," Consolidated Final Staff Report to the Commission, *Certain Hot-Rolled Steel Flat*

*Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United*

*Kingdom*, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Final) (Sept. 28, 2016) (C.R.

Doc. 604) ("Staff Report") at H-3, which presents monthly data on the share that subsidized

Turkish imports occupied of total U.S. imports.[10]  *See also Views of the Commission*

at 13-14 n.54.

Discussing Table H-1, Nucor argues that "[t]he volumes of relevant Turkish imports,

both on an absolute basis and as a share of total U.S. hot-rolled steel imports . . . contradict the

Commission's conclusion that such imports were 'sporadic.'"  Pl.'s Br. 28.  Rather than being

"sporadic," Nucor claims that "hot-rolled steel imports from Turkey, excluding those from

Colakoglu, were significant and substantially increasing during the POI."  *Id*.  The court

disagrees.  Table H-1 supports the Commission's characterization of the subsidized imports from

Turkey as sporadic.  Import volumes are shown for 39 months (all 12 months of 2013, 2014 and

2015, and the first three months of 2016).  For 27 or 28 of the 39 months shown in Table H-1,

the monthly import volumes of subsidized Turkish imports, as a percentage of the volume of

total U.S. imports of hot-rolled steel, can be fairly described as miniscule.  While volumes of

subject Turkish imports as shown in Table H-1 were relatively higher during some periods, it

would not be accurate to assert that they were *consistently* significant.  Similarly, while the data

in Table H-1 (and in the related Table H-2, Staff Report at H-4) show an increase in subject

Turkish imports during the POI, the court is not persuaded by Nucor's characterization of the

increase as "substantial."

An analysis of the monthly volume data, shown in Table H-2, demonstrates that for

moving 12-month periods over the course of the period of investigation, the average annual

volume of the subsidized Turkish imports did not reach, or even come very close to reaching, the

---

[10] Table H-1 presents data designated by the Commission as confidential.  Because citing
the specific data in this table and other confidential data in the record is not necessary to a public
explanation of the court's conclusions, the court limits its discussion to general summaries of,
and trends shown by, the data rather than specific items of data.

clause (iv) threshold of 3% of total U.S. imports of hot-rolled steel. *See* Table H-2, Staff Report

at H-4. Moreover, as the ITC points out before the court, "the simple fact is that the statute

requires that the share will imminently exceed three percent, not that it will 'nearly reach' this

threshold." Def.'s Opp'n to Pl.'s Mot. for J. on the Agency Record, 31 (July 13, 2017), ECF

No. 52 ("Def.'s Br."). In summary, the data set forth in Tables H-1 and H-2 demonstrate that the

Commission's finding that subsidized Turkish imports were "sporadic" during the POI is

supported by substantial evidence based on the record as a whole. The Commission reasonably

concluded that these data supported the ultimate finding that "any sustained increase in the

percentage of subsidized subject imports from Turkey relative to all imports is unlikely." *Views*

*of the Commission* at 14.

  Nucor's argument that the ITC's "sporadic" finding ignored evidence that "[h]ot-rolled

steel imports from Turkey, excluding those from Colakoglu, were significant and substantially

increasing during the POI," Pl.'s Br. 28, is also unavailing. Citing Table H-3, Staff Report

at H-5, which was compiled from the questionnaire data of the Turkish producers, Nucor

selectively focuses its attention on certain isolated record data showing a large percentage

increase in the subsidized exports to the United States from Turkey from 2013 to 2015. Pl.'s

Br. 33. Nucor also selectively points to significant increases in subsidized imports to the U.S.

during particular subsets of the relevant 12-month period, drawing data from Tables H-1

and H-2, Staff Report at H-3 and H-4, respectively. *See* Pl.'s Br. 30-32. Nucor claims these

increases are "persuasive evidence that these imports would imminently exceed the 3-percent

threshold." *Id.* 32-33 (internal citation omitted). The increases Nucor mentions, however, are

from very small bases. Increases from such insubstantial bases are minimally probative when

viewed in the context of all the data presented in Tables H-1, H-2, and H-3, which amply support

the ITC's finding that "the record supports a conclusion that there is not a potential that

subsidized subject imports from Turkey will imminently exceed three percent of total imports."

*Views of the Commission* at 14.

> 5.  The ITC Permissibly Found that Turkish Producers Other than Colakoglu Had a "Strong
> Home Market Orientation"

The ITC concluded from record data that the shipments of the Turkish hot-rolled steel

producers subject to the CVD investigation (i.e., those other than Colakoglu) "were

overwhelmingly to the home market" and had a "strong home-market orientation."  *Views of the*

*Commission* at 14 (footnote omitted).  While disputing the characterization of a "strong

home-market orientation," Nucor does not cite evidence rebutting the specific finding that

subsidized Turkish hot-rolled steel shipments were "overwhelmingly" to the domestic Turkish

market, a finding the record data, compiled from questionnaires of the Turkish producers,

entirely supports.  *See* Table H-3, Staff Report at H-5.

In contesting the finding of a "strong home-market orientation," Nucor argues that the

Commission ignored relevant evidence, including evidence that "the percentage of relevant

shipments that were sold in the home market actually *decreased* slightly over the relevant

period."  Pl.'s Br. 33.  The slight decrease does not detract in any meaningful way from the

finding that the shipments in question went overwhelmingly to the domestic market.  Also,

according to Nucor there is "comprehensive evidence showing that Turkish exports are focused

on the United States as a top destination market."  Pl. Nucor Corporation and Pl.-Intervenors

ArcelorMittal USA LLC, AK Steel Corporation, and United States Steel Corporation's Reply

Brief, 21 (Aug. 11, 2017), ECF Nos. 57 (confidential), 58 (public) ("Pl.'s Reply Br.").  Nucor

asserts that "the United States is one of the most attractively priced markets for Turkish imports"

and that "Turkish producers have been increasingly affected by difficult home market conditions

and third-country trade barriers." *Id.* (internal citation omitted).  These subjective

characterizations of the record do not refute the conclusions the ITC drew from the quantitative

record evidence.  Also, Nucor alludes to data on hot-rolled steel exports to the United States that

include exports by Colakoglu, Pl.'s Br. 34-35, which Commerce found not to be subsidized.  In

summary, all of these arguments are unavailing: the producers' questionnaire data summarized in

Table H-3 amply demonstrate not only that the Turkish exporters subject to the CVD

investigation produced predominantly for the home market but also that the relatively small

portion of their production they did export went predominantly to export markets other than the

United States during the POI.  Based on the court's review, the Commission's finding of a

"strong home-market orientation" is well supported by substantial evidence both in the

Table H-3 data and the record as a whole.

### 6.  Nucor's Argument that the ITC Disregarded Inventory Data

Nucor argues that "[d]espite its statement that it typically examines inventories in its

'imminently exceed' analysis . . . the Commission entirely disregarded the absolute and relative

increases in inventories of Turkish hot-rolled steel excluding Colakoglu's products from 2013

to 2015."  Pl.'s Br. 38 (citing *Views of the Commission* at 13 n.53 and Table H-3, Staff Report

at H-5.).[11]  Nucor submits that the ITC's failure to consider the inventories as a factor, in

combination with other shortcomings it alleges, renders the Commission's clause (iv)

determination unsupported by substantial evidence.  *Id.* at 38-39.  This argument is meritless.

Table H-3, Staff Report at H-5, presents end-of-year inventory data of the Turkish

producers other than Colakoglu for 2013, 2014, and 2015 and end-of quarter inventories for the

---

[11] The brief actually cites the Staff Report "at H-5 (Table H-5)."  *Id.*  Because there is no
"Table H-5" on the record, and because Table H-3 appears on page H-5 of the Staff Report, the
court construes the citation to be to Table H-3.

first quarters of 2015 and 2016, i.e., January to March, based on data submitted in response to the Commission's questionnaires.  The Table H-3 data show that total inventories decreased, then increased, then decreased, from year-end 2013 through March 2016.  The quantity of total inventories at the end of that two-year-plus-one-quarter period did not vary significantly from the total inventories at the beginning of the period.  And as the Commission pointed out in its response brief to the court, "the combined subject Turkish producers' reported end-of-period inventory levels as a share of production and as a share of total shipments were relatively low, fluctuating within a fairly narrow band . . . during the period of investigation."  Def.'s Br. 35 (citing Table H-3, Staff Report at H-5).

    The court cannot conclude that the Commission "disregarded" the inventory data in the Staff Report.  To the contrary, it is understandable why the Commission did not see a need to mention the inventory data in *Views of the Commission*: even if viewed in isolation, these inventory data would not support a finding that the volume of subsidized imports have the potential imminently to account for more than 3% of the volume of all U.S. hot-rolled steel imports.  This is all the more apparent when the inventory data are viewed in the context of the record data showing that the production of the Turkish producers other than Colakoglu went predominantly to the domestic market and the data showing that their export shipments went predominantly to markets other than the United States.

<u>7.  Nucor's Remaining Argument Lacks Merit</u>

    While not specifically including it in the summary of its arguments, Pl.'s Br. 3, Nucor adds an argument in the body of its brief.  The court rejects this argument for the reasons that follow.

Nucor objects to the ITC's finding that subsidized Turkish imports constituted "a relatively small share of total Turkish exports to the U.S. market from 2013 to 2015." *Views of the Commission* at 14 (footnote omitted); *see also* Pl.'s Br. 29.  Plaintiff claims this conclusion is "erroneous," Pl.'s Br. 29, and argues that, in any case, "the Commission's focus on the size of the share of non-Colakoglu [i.e. subsidized] imports compared to total Turkish imports was arbitrary and misplaced." *Id.* 30.  This argument is unpersuasive.

Nucor is correct that 19 U.S.C. § 1677(24)(A)(iv) bases its negligibility analysis on whether "there is a potential that imports from a country described in clause (i) [i.e., 'imports from a country of merchandise corresponding to a domestic like product'] . . . will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States."  That does not mean that it was "arbitrary" or "misplaced" for the ITC to address additional evidence regarding subsidized Turkish imports among its various findings.  Nor was it "erroneous," on that evidence, for the Commission to find that the share of subsidized Turkish imports as a percentage of total Turkish imports into the U.S. was "relatively small," *Views of the Commission* at 14.  *See* Tables VII-25 and H-1, Staff Report at VII-39 and H-3, respectively.  Based on the court's review, substantial record evidence supports this finding.  The court, therefore, determines that the Commission permissibly considered trends in subsidized Turkish imports as a percentage of total Turkish imports into the United States.

### III. CONCLUSION

The court holds that the ITC did not misinterpret the statutory provisions governing the negligibility determination under clause (i) of 19 U.S.C. § 1677(24)(A).  The court also holds that substantial evidence supports the factual findings Nucor challenged in contesting the Commission's negative threat determination under clause (iv) of that provision.  Because the

Commission correctly construed the statute in determining that subsidized Turkish imports of

hot-rolled steel were negligible under clause (i) and permissibly found that the exception to

negligibility in clause (iv) did not apply, the court sustains the Commission's termination of the

countervailing duty investigation of hot-rolled steel from Turkey.  The court, therefore, will deny

Nucor's motion for judgment on the agency record and, pursuant to USCIT Rule 56.2, will enter

judgment for defendant.

                                                       /s/  Timothy C. Stanceu
                                                   Timothy C. Stanceu, Chief Judge


Dated:  February 28, 2018
           New York, New York